JAMES F. MCKAY III, Chief Judge.
hThe defendant, Yutico Briley, appeals his convictions for count one, armed robbery with a firearm, and count three, resisting arrest. He also appeals the trial court’s denial of his motion for new trial and post judgment verdict of acquittal. Finding no error, we affirm the defendant’s conviction and sentence for resisting arrest. However, while we affirm the defendant’s conviction for armed robbery with a firearm, the record evidences an errors patent with regard to the sentencing. Therefore, we remand the matter for clarification and/or resentencing in accordance with La. R.S. 14:64.3 and La. R.S. 15:529.1.
STATEMENT OF THE CASE
On January 11, 2013, Yutico Briley (“defendant”), was charged by bill of information with count one, armed robbery with a firearm, a violation of La. R.S. 14.64.3, count two, convicted felon in possession of a firearm, a violation of La. R.S. 14:95.1[1], and count three, resisting arrest, a violation of La. R.S. 14:108.
On April 24, 2013, the defendant was found guilty by a twelve-person jury with respect to count one, the charge of armed robbery with a firearm. With |2regard to count three, the charge of resisting arrest, *636 the defendant was found guilty “by [the] judge.” On April 30, 2013, the defendant filed a motion for new trial and a motion for a post-judgment verdict of acquittal. Both motions were denied.
On May 31, 2013, the State filed a notice of information with the trial court, advising that on May 30, 2013, the State had met with the victim, Benjamin Joseph (“victim”), who had become concerned for his safety after receiving a letter from the defendant dated May 8, 2013.[2]
On June 17, 2013, with respect to the armed robbery with a firearm charge, the defendant was sentenced to fifty years at hard labor without benefit of probation, parole, or suspension of sentence, with credit for time served, to run concurrently with the other sentences. With respect to the charge of being a convicted felon in possession of a firearm, the defendant was sentenced to twelve years at hard labor, to run concurrently with the other sentences[3]. With respect to the charge of resisting arrest, the defendant was sentenced to ninety days in Orleans Parish Prison, with credit for time served, to run concurrently with the other sentences.
The State filed a multiple-bill based on a prior 2011 conviction for possession of cocaine with intent to distribute. On June 24, 2013, after the ¡.¡multiple offenders hearing, the trial court adjudicated the defendant as a double offender and resen-tenced the defendant to sixty years at hard labor pursuant to La. R.S. 15:529.1, again noting that the armed robbery was a crime of violence. See La. R.S. 14:64.3.
On December 23, 2013, counsel for the defendant filed a supplemental brief. On January 27, 2014, the defendant filed a pro se supplemental brief, as well as a motion to remand the matter back to the trial court so that the court could rule on his pro se motion for new trial. On February 2, 2014, this Court remanded the matter to the trial court solely to rule on the defendant’s motion for new trial, if the court had not already done so. On April 24, 2014, after a hearing, the trial court denied the defendant’s motion for new trial. On June 11, 2014, the defendant filed a second supplemental pro se appellate brief.
STATEMENT OF FACT
On November 27, 2012, at approximately 2:15 a.m., Benjamin Joseph (“victim”) was returning to his home at 304 South Cortez Street after working as a sound recording engineer. As he exited his vehicle, he was approached at gun point by two young black males. He was robbed at gun point of his wallet which contained around $102.00 in cash. The perpetrators attempted to take his cell phone, but he threw it to the ground. After the perpe *637 trators fled, the victim put his cell phone back together and called 911 and reported the incident.
Later that afternoon, Detective Kellie Morel took over the investigation of the incident. She spoke to the victim who gave her a detailed description of the perpetrators. The victim described the perpetrator with the gun as a seventeen to nineteen year old male, “slim build, medium complexion, low hairstyle,” and approximately five feet ten inches tall and wearing a gray hoodie-style pullover [¿sweatshirt. He described the gun used in the robbery as a semi-automatic, black and silver pistol. He described the second perpetrator as approximately five feet eight inches tall and wearing a blue and white striped shirt.
On the evening of November 27, 2012, Officer Shelton Abram and Officer Jason Berger were assigned to proactive duty on the Task Force Unit, a unit that proactively looked for guns, drugs, violent offenders, and hot calls in progress. At approximately 5:25 p.m., they reported to work and were briefed on pertinent activity that had occurred in the district before their shift had started. They were alerted that an armed robbery had occurred around 2:00 a.m. that morning on South Cortez Street, and were provided with a description of the suspects. One of the suspects was described as a black male clad in a gray hooded sweatshirt and armed with a black and silver handgun. Officer Abram and Officer Berger observed a suspect in the 600 Block of South Pierce Street, who matched the description and was acting suspicious by “constantly looking over his shoulder” as the officers approached, and “clutching his right hip” with his right hand as he walked. The officers also observed “a bulge protrude from the right side of his hip.” As the officers “rolled up” next to the defendant, he “took off running [at a] full sprint.” The officers ultimately apprehended the defendant at approximately 8:00 to 8:30 p.m. in a vacant lot in the 600 block of South Scott Street, which is about three blocks from where the robbery had occurred and one block away from where the officers first spotted the defendant. As Officer Abram was placing the defendant in handcuffs, a black and silver handgun fell from the defendant’s pants Ifjleg. The defendant was found to be in possession of a loaded black and silver semi-automatic handgun, as well as approximately $103.00.[4]
At around 10:00 p.m., that same evening, the defendant was in custody at the New Orleans Police Department First District. The defendant was wearing a gray hooded sweatshirt with “a small little Polo emblem,” dark colored pants and tennis shoes.
The victim was notified by the NOPD and advised that they had a subject in custody and asked that he report to the First District Police Station on North Rampart Street; “[t]hey wanted [him] to come look at a possible suspect.” The victim was admittedly “nervous” because he feared that “the guy who pretty much threatened [his] life would see [him].” After the victim calmed down he was place in the front passenger seat of a police vehicle. The officers then conducted a show-up or one-on-one identification procedure where a spotlight was shown on the defendant so that the defendant could not see the victim sitting in the front passenger seat of the police vehicle. At the time of the identification, the defendant was handcuffed and *638 approximately fifteen to twenty feet away from the victim. At the victim’s behest, the officer put the hood from the defendant’s sweatshirt over the defendant’s head; the victim identified the defendant with the hood of the sweatshirt both on and off of the defendant’s head as the perpetrator with the gun. He also identified the gun as the weapon that the defendant had used to rob him. The victim identified in open court, both the defendant as the perpetrator who robbed him and the gun that he used in the robbery.
ERRORS PATENT
A review of the record evidences an error patent with regard to sentencing the defendant for his conviction for one count of an armed robbery with a fire arm. La. R.S. 14:64.3 provides, in pertinent part:
A. When the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned at hard labor for an additional period of five years without benefit of parole, probation, or suspension of sentence. The additional penalty imposed pursuant to this Subsection shall be served consecutively to the sentence imposed under the provisions of R.S. 14:64.
In this case, when the trial court adjudicated the defendant as a double offender pursuant to La. R.S. 15:529.1,[5] the trial court vacated the defendant’s original sentence and resentenced the defendant to sixty years at hard labor, with credit for time served, but did not include an additional five years to be served without benefit of parole, probation, or suspension of sentence.
The Louisiana Supreme Court in State v. King, 2006-1903, p. 8 (La.10/16/07), 969 So.2d 1228, 1232, held that the additional five-year sentence' provided by La. R.S. 14:64.3 can be imposed when the defendant is sentenced pursuant to the habitual offender law.
This Court has previously held that a sentence is indeterminate and illegally lenient when the trial court fails impose a consecutive five-year enhancement sentence as mandated by La. R.S. 14:64.3(A). In State v. Burton, 2009-0826, p. 3 (La.App. 4 Cir. 7/14/10), 43 So.3d 1073, 1076, this Court stated “[i]n cases where the minimum sentence was not imposed ... that the sentences are indeterminate, requiring that the sentences be vacated and the matter remanded for resentencing |7according to law for clarification of whether the defendant’s sentence includes any additional punishment under La. R.S. 14:64.3.” Id. As a result, the Burton Court vacated the defendant’s sentence and remanded the matter for resentencing.
In State v. Adams, 2010-1140, p. 11 (La.App. 4 Cir. 6/1/11), 68 So.3d 1165, 1172-1173, this Court also remanded a case for a new sentencing hearing when it was unclear if the trial court failed to impose the “additional five years in prison pursuant to La. R.S. 14:64.3” or merely “failed to specify that it had done so.”
Accordingly, because the trial court failed to articulate whether the sentence it imposed included the mandatory additional five years for armed robbery with a firearm under La. R.S. 14:64.3(A), the sixty-year sentence is vacated and the matter remanded for clarification and/or resen-tencing in accordance with La. R.S. 14:64.3 and La. R.S. 15:529.1.
*639 DISCUSSION
ASSIGNMENT OF ERROR NUMBER 1
The defendant argues that the evidence does not support the jury verdict, and that the jury did not act as a rational one, even evaluating the evidence pursuant to the Jackson standard. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
This Court recently recognized the Jackson standard in State v. Pierce, 2012-0879, p. 3 (La.App. 4 Cir. 12/10/13), 131 So.3d 136, 139:
When reviewing the sufficiency of the evidence to support a conviction, this court is controlled by the standard set forth by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which dictates that to affirm a conviction “the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984).
1 ^Likewise, “[a]ll evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard.” State v. Pierce, 2012-0879, p. 3, 131 So.3d at 139 (citing State v. Jacobs, 504 So.2d 817 (La.1987)). The Pierce Court also recognized that the testimony of one witness, if believed by the jury, is sufficient to support a factual conclusion:
In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Robinson, 02-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79 (citation omitted). Under the Jackson standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court. State v. Juluke, 98-341 (La.1/8/99), 725 So.2d 1291, 1293 (citation omitted). “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992) (citation omitted).
A fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Where rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned. State v. Winston, 11-1342, pp. 8 (La.App. 4 Cir. 9/12/12), 100 So.3d 332, 337 (citations omitted).
When the identity of the defendant as the perpetrator is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia, supra. State v. Galle, 2011-0930, p. 31 (La.App. 4 Cir. 2/13/13), 107 So.3d 916, 935; State v. Everett, 11-714, p. 15 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 619, writs denied, 12-1593, 12-1610
(La.2/8/13), 108 So.3d 77.
State v. Pierce, 2012-0879, p. 4, 131 So.3d at 140.
In this case, the evidence was sufficient to support the jury verdict.
Detective Morel testified that the victim described the perpetrator with the handgun as a seventeen to nineteen year old male, with a slim build, medium complexion, and a low hairstyle. Detective Morel further testified that the victim |fladvised that the perpetrator with the handgun was *640 approximately five feet, ten inches tall and wore a gray hooded sweatshirt. Detective Morel also testified that the victim described the weapon pointed at him by the perpetrator as a semiautomatic, black and silver pistol. Detective Morel testified that the defendant was apprehended that evening approximately three blocks from where the robbery occurred; that the defendant was wearing a gray hooded sweatshirt; that the defendant was carrying a black and silver semi-automatic handgun; and that the defendant was in possession of approximately, the same amount of currency that had been removed from the defendant’s wallet earlier that day. With regard to the identification of the defendant, Detective Morel testified that after the victim calmed down, he advised the officers “that’s him” and “that’s the man with the gun” after viewing the defendant in a spotlight for two to five minutes from approximately fifteen to twenty feet away. Detective Morel also testified that when she showed the victim the gun that had been seized from the defendant, the victim said “that’s the gun.”
The victim testified that the lighting on the street at the time of the robbery was “pretty good”; that he was standing approximately eight or ten feet from the defendant; that he got a good look at the defendant’s face; and that he “had a lot of eye contact” with the defendant. The victim testified that the defendant was wearing a gray hoodie, with the hood up, and that the defendant had “[k]ind of a full face, African American, not very dark skin,” slim build, between five feet eight inches and five feet eleven inches tall. The victim testified that he relayed the physical description and clothing description to the responding officers, as well as the fact that the robbers removed approximately “between 102 and 107 dollars” in cash from his wallet during the robbery. The victim further testified that he | indescribed the gun used as having a “black handle, chrome top” and was “either a 9mm or a 45” but “nothing smaller.”
With regard to the identification of the defendant, the victim testified that, after viewing the defendant for a “minute or two,” he recognized the defendant as the individual who pointed the gun in his face while robbing him. The victim also testified that he recognized the defendant with the hood of the sweatshirt both on and off.
Additionally, Officer Abram testified that he observed the defendant near the location of the robbery, wearing a gray hooded sweatshirt, “constantly looking over his shoulder” as Officer Abram and his partner approached. Officer Abram also testified that the defendant was “clutching his right hip” as he walked and that “a bulge protrude[d] from the right side of his hip.” Officer Abram testified that the defendant “took off running [at a] full sprint” as he and his partner approached. When the defendant was apprehended, Officer Abram testified, a black and silver handgun was seized from the defendant’s pant leg, as well as approximately $103.00 in cash.
The defendant contends that there was nothing specific in the victim’s identification of him, such as distinctive facial characteristics or facial hair, which is evident on the defendant’s booking photograph. However, as previously noted, the victim’s description of the perpetrator with the gun included specific facial characteristics, including the description of the perpetrator as having a “full face” with “not very dark skin,” as well as a “low hairstyle.” The defendant also argues that the victim did not mention the red Polo logo on the sweatshirt and testified that he observed no customization of the weapon used in the robbery. However, hi although the victim did not testify regarding the small Polo *641 logo on the sweatshirt, Detective Morel testified that the logo was a “small little Polo emblem.”
The defendant concedes that the credibility of witnesses is not reviewed on appeal, but nevertheless argues that the victim’s ability to perceive events at the time of the robbery was impaired because his mental condition as depicted in the 911 call and as described by Detective Morel at trial during the identification procedure suggest that the victim was too terrified to have noticed physical characteristics of his perpetrator. Likewise, the defendant argues that the victim was so terrified at the time of the show-up identification that he made his identification of the defendant solely because he was handcuffed and flanked by police officers, wearing a gray hooded sweatshirt, and reportedly carried a black and chrome handgun.
The victim testified that he had a good view of the defendant’s face and “a lot of eye contact” at the time of the robbery, and he recognized the defendant by his face during the show-up identification. Accordingly, the record does not support the argument that the victim made his identification of the defendant solely because he was handcuffed, flanked by police officers, wearing a gray hooded sweatshirt and carrying a black and chrome handgun. Furthermore, a review of the 911 recording evidences that the victim was composed and rational in reporting the robbery to the 911 operator. At the show-up identification, Detective Morel testified that the victim was nervous at first because he feared the perpetrator could see him sitting in the police car, but was able to calm down before making the identification of the defendant. Likewise, the victim testified that he was “kind of freaked out at first” during the identification procedure, but he calmed down after a couple of minutes. Thus, the record does not evidence that the victim’s ability to | ^perceive events at the time of the robbery was impaired or that he was too terrified at the time of the show-up identification to accurately identify the defendant as the perpetrator.
In the defendant’s December 23, 2013 supplemental counseled brief, he argues that in the 911 phone call, the victim did not mention a hooded sweatshirt, a logo, or the fact that the perpetrator had the hood of the sweatshirt up during the robbery. The defendant further submits that the 911 CD evidences that the victim described the perpetrators’ clothing as “sweaters,” including a description of the second perpetrator’s sweater as having “subtle blue and black stripes” going “left to right.” The defendant also argues that the CD evidences that when the 911 operator pressed the victim for a further description, he did not provide any further details, advising the operator that it happened “kind of fast” and that it was “kind of dark.” Thus, the defendant argues that his conviction should be reversed because the information relayed to the 911 operator differed from the victim’s testimony at trial.
A review of the 911 recording clearly evidences that the victim described the perpetrator with the gun as a black male wearing a “gray sweater” and jeans. The difference between a “gray sweater” and “gray sweatshirt” is not a significant discrepancy. Additionally, Detective Morel’s testimony regarding the victim’s description of the defendant was substantially similar to the victim’s testimony regarding the description he provided officers of the defendant. Officer Abram’s testimony regarding the description provided to officers of the perpetrator with a gun was also substantially similar to the victim’s testimony regarding the description he provided officers at trial. Furthermore, *642 although the victim did advise the 911 operator that it happened “kind of fast” and it was dark, as | ^previously noted, the victim testified at trial that the street had good lighting, and he had a good view of and made eye contact with the defendant. Therefore, considering the consistency of the trial testimony regarding the clothing description of the defendant, the record does not evidence that the jury did not act rationally in finding that the evidence was sufficient to support a guilty verdict for armed robbery. Thus, this argument lacks merit.
Finally, in the defendant’s January 27, 2014 pro se supplemental brief, he argues that the victim’s identification of him was questionable because he testified that the perpetrator with the gun was eight to ten feet away; that although the victim described the perpetrator with the gun as having a “low hairstyle,” it would not be possible for the victim to see the perpetrator’s hairstyle if the hood of the sweatshirt was over the perpetrator’s head during the robbery; that the victim did not state in the 911 call that the gunman was wearing a hooded sweatshirt; and that “the State also did not present any evidence at trial that the location [the defendant] ran to was two to three blocks from the location of the robbery.”
For the reasons discussed above, the fact that the victim indicated to the 911 operator that the defendant was wearing a “gray sweater” rather than a gray hooded sweatshirt does not support the argument that the evidence was insufficient to support the jury verdict. With regard to the description of the gunman as having a “low hairstyle,” it could have been possible for the victim to partially view the defendant’s hairstyle even with the hood of the sweatshirt raised. In any event, the victim testified that he had a good view and a lot of eye contact with the defendant during the robbery, and he testified that he recognized the defendant by his face at the show-up identification.
114The defendant also argues that the victim did not testify regarding any customizations to the gun, the victim’s description of the gun matched the gun that was seized from the defendant, and the victim identified the gun at the time of the show-up identification of the defendant as the gun that was pointed at his face. Additionally, the victim identified the gun at trial.
With regard to the defendant’s argument that the State did not present any evidence that the location to which the defendant fled when attempting to evade officers was two to three blocks from the location of the armed robbery, Detective Morel testified that the defendant was apprehended on “South Pierce Street approximately three blocks from where the initial robbery occurred. It was three blocks down.” Additionally, Officer Abram testified that the defendant was apprehended in a vacant lot on the 600 block of South Scott Street, which was approximately one block from the 600 block of South Pierce Street. The State established that the defendant was both initially observed and apprehended in the near vicinity of the location of the armed robbery earlier that morning.
For the reasons discussed with respect to the second assignment of error, the defendant’s pro se argument that the victim’s identification of him was questionable because he was eight to ten feet from the defendant at the time of the robbery is not supported by the record. This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER 2
The defendant next argues that the trial judge abused his discretion in denying the motion to suppress the identification and erred in allowing as evidence at trial both *643 the out-of-court identification and the tainted in-court identification flowing directly from it. The defendant’s December 23, 2013 counseled supplemental brief also raises the argument that the identification procedure was |1Bsuggestive and that the trial court erred in failing to grant the motion to suppress. Additionally, in the defendant’s pro se supplemental brief filed on January 27, 2014, he argues that the identification procedure in this case was suggestive. The defendant also argues that there was a likelihood of misidentification because the victim testified that he was eight to ten feet away from the defendant during the quick robbery.
In State v. Norah, 2012-1194, p. 12 (La.App. 4 Cir. 12/11/13), 131 So.3d 172, 183, this Court recognized that a trial court’s ruling with regard to a motion to suppress identification will not be disturbed absent an abuse of discretion:
We review a trial court’s determination on the admissibility of an out-of-court identification and its subsequent denial of a motion to suppress for abuse-of-discretion. See State v. Brown, 09-0884, p. 3 (La.App. 4 Cir. 3/31/10), 36 So.3d 974, 978; State v. Bickham, 404 So.2d 929, 934 (La.1981). Our review is not limited in scope to the evidence introduced at the hearing on the motion to suppress; rather, our consideration extends to all pertinent evidence adduced at trial. See State v. Chopin, 372 So.2d 1222, 1224 n. 2 (La.1979); State v. Williams, 572 So.2d 756, 757 (La.App. 4th Cir.1990).
“To prevail on such a motion, a defendant must show that the identification procedure in question was suggestive, [s]ee Manson v. Brathwaite, 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Simmons v. United States, 390 U.S. 377, 384-385, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and that the procedure created a substantial likelihood of misidentification such that defendant was denied due process of law.” State v. Norah, 2012-1194, p. 13, 131 So.3d at 184 (citing Neil v. Biggers, 409 U.S. 188, 196, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); State v. Prudholm, 446 So.2d 729, 738 (La.1984)). To meet the burden of establishing that the identification procedure was suggestive, a defendant may “attempt[] to show that the police’s conduct in organizing and administering the identification was improper.” State v. Norah, 2012-1194, p. 13, 131 So.3d at 184 (citing Perry v. New Hampshire, — U.S. -, -, 132 S.Ct. 716, 724, 181 L.Ed.2d 694 (2012)). This Court has “long-held that an identification is suggestive if the witness’ attention is ‘unduly focused’ on the defendant.” State v. Norah, 2012-1194, p. 13, 131 So.3d at 184 (citing State v. Brown, 2009-0884 at p. 5, 36 So.3d at 979; State v. Robinson, 386 So.2d 1374, 1377 (La.1980)).
In this case, the identification made by the victim was a “show-up” or one-on-one identification, which is “an identification procedure ... whereby a victim is asked whether the victim recognizes the person suspected to be the perpetrator of a crime against the victim.” State v. Norah, 2012-1194, p. 14, 131 So.3d at 184 (citing State v. Harold, 03-0649, p. 6 n. 2 (La.App. 4 Cir. 11/12/03), 861 So.2d 262, 265). “One-on-one identifications are not favored by the law, but they are nevertheless permissible when justified by the overall circumstances.” State v. Brown, 2009-0884, p. 5 (La.App. 4 Cir. 3/31/10), 36 So.3d 974, 979 (citing State v. Dunbar, 356 So.2d 956, 962 (La.1978)). Thus, “[s]uch procedures are permissible when, for example, the accused is apprehended within a short time after the offense and is returned to the scene of the crime for immediate identification, because, under appropriate circumstances, a prompt in-the-field *644 identification promotes accuracy and expedites the release of innocent suspects.” State v. Brown, 2009-0884, pp. 5-6, 36 So.3d at 979 (citing State v. Bickham, 404 So.2d 929, 934 (La.1981)). Additionally, this Court has determined that “[a] show up, without more, is not suggestive per se,” and “[s]uggestiveness of an out-of-court identification alone ... does not necessitate suppression.” State v. Norah, 2012-1194, p. 14, 131 So.3d at 184 (citing Perry, 132 S.Ct. at 724).
Although this Court has held that a show-up identification, without more, is not necessarily suggestive, in this case, the defendant was in the spotlight, 117handcuffed, flanked by at least one police officer, and the hood of his sweatshirt was raised over his head and lowered. Additionally, the victim testified that before the identification, officers advised him that “[t]hey wanted me to come look at a possible suspect.” Considering these factors, even though the victim testified that he was not coerced into identifying the defendant, the one-on-one/show-up identification in this case was arguably suggestive.
Assuming arguendo that the show-up identification procedure was suggestive, this Court must determine whether there was a likelihood of misidentification. With regard to determining whether there was a likelihood of misidentification of a suspect, this Court has stated:
In determining the likelihood of mis-identification of a suspect, a court must look to the “totality of the circumstances” as informed by the five factors set forth by the United States Supreme Court in Neil v. Biggers, supra, 409 U.S. at 199-200, 93 S.Ct. 375. These factors include “the opportunity of the witness to view the criminal at the time of the crime, the witness’ degree of attention, the accuracy of the witness’ prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.” , Id. Any corrupting effect of a suggestive identification is to be weighed against these factors. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).
State v. Brown, 2009-0884, p. 5, 36 So.3d at 979.[6]
With regard to the first factor, the opportunity of the witness to view the perpetrator at the time of the crime, the victim testified at trial that he was eight to | 18ten feet from the defendant, and the lighting on the street was “pretty good.” The victim also testified that he was able to get a good look at the defendant’s face, stating that he “had a lot of eye contact” with the defendant. Thus, although there was no daylight at the time of the robbery, the victim had ample lighting and opportunity to view the defendant at the time of the crime.
The second factor, the witness’ degree of attention, also weighs in favor of the State. The victim testified that the defendant was the perpetrator closest to him and the one that he “g[o]t the best look at.” Additionally, the victim testified that he “didn’t pay too much attention” to the perpetrator without the gun, and he responded in the *645 affirmative when asked whether he was focused on the perpetrator with the gun. The victim testified “I looked at his face.” Thus, although the robbery encounter took only a few minutes, the victim’s attention was highly focused on the defendant.
With regard to the third factor, the accuracy of the witness’ prior description of the perpetrator, Detective Morel testified that the victim described the perpetrator with the gun as a seventeen to nineteen year old male, slim build, medium complexion, low hair style, approximately five feet ten inches tall, and wearing a gray hooded sweatshirt. The victim testified that he described the perpetrator with the gun, as an African-American male, with “[k]ind of a full face, not very dark skin,” between five feet eight inches and five feet eleven inches tall, slim build, and wearing a gray hooded sweatshirt.
With regard to the fourth factor, the level of certainty demonstrated by the witness at the confrontation, this factor weighs in favor of the State. Although the victim testified that he was “kind of freaked out at first” and “nervous” prior to identifying the defendant, he also testified that he calmed down prior to making his | ^identification. The victim testified that after he calmed down and viewed the defendant for “a minute or two,” he recognized the defendant ,by his face as the perpetrator with the gun. He also testified that he recognized the defendant with the hood of the sweatshirt both on and off. Additionally, Detective Morel testified that when the victim identified the defendant, he said “that’s him” and “that’s the man with the gun.”
The fifth factor, the length of time between the crime and the confrontation, was discussed by in State v. Brown, 2009-0884, p. 8, 36 So.3d at 980, wherein this Court recognized that with respect to show-up identifications, the length of time between the crime and the confrontation factor is typically satisfied when the identification occurs within an hour of the crime:
State v. Bickham requires that the show up identification occur within a short time after the offense. This temporal factor is generally satisfied when the identification occurs within an hour of the crime. See, e.g., State v. Valentine, 570 So.2d 533, 537 (La.App. 4 Cir.1990), and see also State v. Harold, supra, at n. 2 (finding that the final Big-gers factor is satisfied when the entire criminal episode, from the time of the crime to the identification, takes place within an hour). Here, approximately 30-40 minutes transpired between the commission of the crime and the one-on-one show up identification, and Mr. Brown has not pointed to any other evidence or supporting authority to indi- ■ cate that this delay is unreasonable.
In this case, the robbery occurred at approximately 2:00 a.m., and the victim identified the defendant at the show-up identification at approximately 10:00 p.m. Thus, approximately twenty hours elapsed between the crime and the identification. While this delay is longer than what this Court has generally held to be acceptable, this Court has found that a delay of nine hours before a show-up identification was made was valid. See State v. Green, 2010-0791, p. 12 (La.App. 4 Cir. 9/28/11); 84 So.3d 573, 582 (“While nine hours between the crime and the identification might be somewhat longer [than] that in many, even most, one-onjone20 identification scenarios, it is not long at all insofar as identification procedures in general and was done within a short period of time after the defendants were apprehended with the victim’s car.”); see also State v. Buhcannon, 2011-1727, p. 9 (La.App. 4 Cir. 3/13/13); 112 So.3d 312, 318 (relying upon Green to find that “[wjhile a six hour delay may not be ideal, *646 this court recently' upheld a one-on-one identification made nine hours after the crime.”)
In this case, the victim’s identification of the defendant approximately twenty hours after the robbery did not have a “corrupting effect” on the identification. See State v. Brown, 2009-0884, p. 5, 36 So.3d at 979. Thus, although the identification procedure was arguably suggestive, the record does not evidence that there was a substantial likelihood of misidentification. This assignment of error lacks merit.
PRO SE ASSIGNMENT OF ERROR NUMBER 1
With regard to the defendant’s pro se supplemental brief that was filed on June 11, 2014, in a sole supplemental assignment of error, the defendant contends that his motion for new trial should have been granted pursuant to La.C.Cr.P. arts. 851(3) and 854 because new evidence had been discovered after trial, specifically, the victim’s statement to the District Attorney’s office that he was not one hundred percent sure that the defendant was one of the perpetrators who robbed him.[7]
The victim’s indication that he was only eighty-five to ninety percent sure that the defendant was the perpetrator with the gun only after receiving a threatening letter from the defendant in which the defendant attempted to bribe the 121victim is not a sufficient ground to grant a new trial.[8] The victim’s post-trial statement to the District Attorney’s office regarding the change in his percentage of certainty regarding his identification of the defendant is essentially a recantation. The Louisiana Supreme Court has recognized that “recantations are highly suspicious and, except in rare circumstances, a motion for new trial should not be granted on the basis of a recantation since that disclaimer is tantamount to admission of perjury so as to discredit the witness at a later trial.” State v. Prudholm, 446 So.2d 729, 736 (La.1984)(citing State v. Clayton, 427 So.2d 827 (La.1982)). Likewise, this Court has held that “[recantations of trial testimony should be looked upon with the utmost suspicion.” State v. Ward, 542 So.2d *647 737, 739 (La.App. 4th Cir.1989)(citing State v. Tyler, 342 So.2d 574 (La.1977)). The Ward Court also recognized that “[t]o refuse to grant a new trial on such a basis is not an abuse of discretion” because “[a] recantation at a new trial is a confession to |22perjury which destroys the credibility of the witness.” State v. Ward, 542 So.2d at 739 (citing State v. Linkletter, 345 So.2d 452 (La.1977)).
Additionally, it is well-settled that to obtain a new trial based upon allegedly newly discovered evidence, the following prerequisites must be met:
In order to obtain a new trial based on newly discovered evidence, the defendant must show: (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of trial was not due to the defendant’s lack of diligence; (3) the evidence is material to the issues at trial; .and (4) the evidence is of such a nature that it would probably have changed the verdict of guilty. La.C.Cr.P. art. 851(3); State v. Brisban, 2000-3437, p. 12 (La.2/26/02), 809 So.2d 923, 931; State v. Lindsey, 2012-1195, p. 13 (La.App. 4 Cir. 11/20/13), 129 So.3d 759, 767. A trial court assessing the legal merits of a motion for new trial is given considerable latitude in evaluating the reliability of the evidence and its impact on the verdict. State v. Taylor, 2012-0114, p. 12 (LaApp. 4 Cir. 11/28/12), 104 So.3d 679, 687, writ denied, 2012-2599 (La.5/3/13), 113 So.3d 211. A trial court’s ruling on a motion for new trial will not be disturbed on appeal absent a clear showing of abuse of discretion. State v. Quimby, 419 So.2d 951, 960 (La.1982).
State v. Weathersby, 2013-0258, pp. 20-21 (La.App. 4 Cir. 4/16/14), 140 So.3d 260, 273.
Additionally, La.C.Cr.P. art. 854 provides:
A motion for a new trial based on ground (3) of Article 851 shall contain allegations of fact, sworn to by the defendant or his counsel, showing:
(1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial;
(2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;
(3) The facts which the witnesses or evidence will establish; and
(4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available.
The newly discovered whereabouts or residence of a witness do not constitute newly discovered evidence.
123In the defendant’s motion for new trial, he asserted that the post-trial statement made by the victim to the District Attorney’s office was not a recantation, but “confirms and strengthens [the victim’s] testimony that he was focused on other circumstances, which according to his 911 call, happened kind of fast.” Thus, the defendant did not establish that the victim’s post-trial statement was not a recantation, but instead attempted to make a sufficiency argument. Most importantly, the defendant ignored the fact that the victim made his post-trial statement only after receiving a letter from the defendant in which the defendant not only vaguely threatened the victim, but also offered to pay him to change his trial testimony. At the hearing on the defendant’s motion for new trial, the trial court questioned the defendant regarding the offer of money in his correspondence to the victim, and the defendant admitted to offering the money. The trial court suggested that the offer of money to the victim tainted his “slight *648 change of heart,” denying the defendant’s motion and finding as follows:
However, as the law stands today the identification issue, sir, was a factual determination and a factual finding that was up to the jury to make and they made it. This Court cannot state as a matter of law that the change from 100 percent to 85 to 90 percent assuredness especially when we add the money component. [sic] It[’]s such that had that testimony been the original testimony I need to be convinced that that would have changed the verdict in this case. I got to be honest with you. With what is before me I am not convinced that slight percentage change would have changed the outcome in this case. That is the standard that this Court has to go by. As such unfortunately I have to deny your motion for a new trial.
The trial, court did not abuse its discretion in denying the defendant’s .motion for new trial. As previously noted, the defendant’s alleged newly discovered evidence was a recantation by the victim of his trial testimony that he was one hundred percent certain the defendant was the perpetrator who robbed him with a gun, wherein he indicated that he was eight-five to [^ninety percent certain. As previously noted, “recantations are highly suspicious and, except in rare circumstances, a motion for new trial should not be granted on the basis of a recantation since that disclaimer is tantamount to admission of perjury so as to discredit the witness at a later trial.” State v. Prudholm, 446 So.2d at 736. Furthermore, the recantation is made even more suspicious by virtue of the fact that it resulted directly from the victim’s receipt of correspondence from the defendant in which the defendant threatened and attempted to bribe him. Additionally, as the trial court noted, the defendant did not establish that this slight percentage change was of such a nature that it would have changed the guilty verdict. See State v. Weathersby, 2013-0258, pp. 20-21, 140 So.3d at 273. This assignment of error lacks merit.
CONCLUSION
For the foregoing reasons, the defendant’s conviction and sentence is affirmed with respect to the violation of La. R.S. 14:108, resisting arrest. However, because the trial court failed to articulate whether the sentence it imposed included the mandatory additional five years for armed robbery with a firearm under La. R.S. 14:64.3(A), the conviction is affirmed and the sixty-year sentence is vacated and remanded for clarification and/or resen-tencing in accordance with La. R.S. 14:64.3 and La. R.S. 15:529.1.
CONVICTION AND SENTENCE AFFIRMED; VACATED IN PART AND REMANDED IN PART.

. Regarding count two, on April 24, 2013, the defendant withdrew his plea of not guilty and entered a guilty plea to the charge of a convicted felon in possession of a firearm. See La. R.S. 14:95.1. The defendant is not appealing this conviction and sentence.

. The letter from the defendant advised the victim that his sentencing hearing was set for May 12, 2013, and he wanted the victim to be there "to witness how you threw my life away.” The defendant contended that at the time the victim was robbed, he was at the Evergreen Motel, and he only carried a gun to protect himself because several of his friends had been killed. He further advised the victim that he "had your address since January and I never had intentions on doing you anything [sic].” The defendant suggested that the two men who robbed the victim were still "out there” and could rob him again. The defendant requested that the victim go to the District Attorney’s office and "tell the truth ... or that you are not sure who robbed you.” The defendant averred that his family would have to spend $10,000.00 on his appeal, "so if you want money to tell the truth, my family would pay and if the District Attorney co-hersed [sic] you, we could both file civil suit[s] and gain financially] too.” The defendant concluded by providing the phone numbers of his mother and father, stating, “please call they will pay you if that’s what you want sir.”

. As previously noted, on April 24, 2013, the defendant pled guilty to this charge.

. We note, the victim asserted that he had $102.00 in his wallet at the time he was armed robbed. However, eight hours later the defendant was arrested with approximately $103.00.

. It is noted that the sentence is within the appropriate range pursuant to La. R.S. 15:529.1.

. This Court recognized the five Manson factors in State v. Santos-Castro, 2012-0568, pp. 21-22 (La.App. 4 Cir. 7/31/13), 120 So.3d 933, 946-47, as follows:
The five factors include: 1) the witness’s opportunity to view the criminal at the time of the crime; 2) the witness’s degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Manson, 432 U.S. at 114-15, 97 S.Ct. at 2254.

. As previously noted herein, in the defendant’s pro se supplemental brief filed on January 27, 2014, he contends that although Detective Morel testified that the victim described the gunman as having a low hairstyle, it would be impossible for the victim to know the gunman’s hairstyle if the sweatshirt hood was up the entire time of the robbery. The defendant also notes that the victim expressed to the State that he was not one hundred percent sure of his identification of the defendant after receiving the defendant’s letter dated May 8, 2013.

. La.C.Cr.P. art. 851 provides:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right. [Emphasis added]